USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  August 8, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                :

UNITED STATES OF AMERICA          :

                                :

                 v.                :            15 Cr. 608-10 (KPF)

                                :

A.O., *a Male Juvenile*,          :           <u>OPINION AND ORDER</u>

                                :

                     Defendant.  :

                                :

------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

On December 17, 2015, the Government filed a sealed superseding juvenile information, S2 15 Cr. 608 (KPF) (the "Juvenile Information" or the "Information"), charging A.O.[1] with committing the following five acts of juvenile delinquency:

    (i)     participating in a racketeering enterprise whose members engaged in, among other things, narcotics trafficking, attempted murder, and murder, in violation of 18 U.S.C. §§ 1961 and 1962(c) (Count One);

    (ii)    participating in a conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d) (Count Two);

    (iii)   the assault and attempted murder of a rival narcotics trafficker associated with a rival narcotics trafficking organization ("V-1"), in violation of 18 U.S.C. §§ 1959(a)(3), (a)(5) and 2 (Count Three);

    (iv)   the assault and attempted murder of a second rival narcotics trafficker associated with a rival narcotics

---

[1]    Pursuant to the statutory requirements of the Juvenile Justice and Delinquency Prevention Act (the "JJDPA"), 18 U.S.C. §§ 5031-5042, all proceedings and documents in this case have been sealed to the extent that they pertain to allegations of acts of juvenile delinquency.  18 U.S.C. § 5038(e).  The JJDPA requires that during a juvenile delinquency proceeding, neither the name nor picture of any juvenile shall be made public.  *Id.*

trafficking organization ("V-2"), in violation of 18 U.S.C. §§ 1959(a)(3), (a)(5) and 2 (Count Four); and

(v)  the use, carrying, possession, and discharge of firearms in connection with A.O.'s membership in the racketeering enterprise charged in Count One of the Information, A.O.'s participation in the racketeering conspiracy charged in Count Two of the Information, and A.O.'s participation in the violent crimes in aid of racketeering, as charged in Counts Three and Four of the Information, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2 (Count Five).

The Government moved under the JJDPA for an order transferring A.O. to adult status and permitting the Government to proceed against him by criminal indictment.  This Court held a hearing on the Government's motion on December 21, 2015, and, after receiving post-argument submissions from the parties, heard argument on the motion on February 23, 2016, and April 5, 2016.

On April 15, 2016, A.O. was charged in a superseding criminal indictment, S3 15 Cr. 108 (KPF) (the "S3 Indictment"), with racketeering and narcotics offenses, and with using or carrying a firearm in connection with those offenses; the Government represented that it charged A.O. in the S3 Indictment after obtaining evidence that A.O. persisted in these offenses after his eighteenth birthday.  The filing of the S3 Indictment has mooted the Government's motion to transfer with respect to Counts One and Two of the Juvenile Information; the Government has stated its intent to proceed on the motion with respect to Counts Three, Four, and Five.  For the reasons outlined below, the Court grants the Government's motion and transfers A.O. for adult criminal prosecution with respect to those three counts.

2

# BACKGROUND

A.    **Factual Background**[2]

1.    **Overview**

The offenses charged in the Juvenile Information stem from A.O.'s participation, for the approximate time period from 2012 through September 2015, in a narcotics-trafficking organization and racketeering enterprise — the "Taylor Avenue Crew" — that sold retail quantities of crack cocaine on Taylor Avenue in the Bronx and that defended its narcotics distribution territory with violence and threats of violence.  (Transcript of December 15, 2015 Hearing ("Tr.") at 88-89 (discussing the distribution of crack cocaine by the Crew, and the commission of acts of violence by Crew members for "[protection of] turf and honor and pride")).  In particular, when individuals who were not members of (or authorized by) the Taylor Avenue Crew attempted to sell narcotics on Taylor Avenue, they were threatened or assaulted.  (Tr. 89-90 ("[N]obody, unless you are . . . from the Taylor Avenue Crew is allowed to sell anything on Taylor Avenue.")).  Members of the Taylor Avenue Crew, including A.O., had access to firearms that were stashed both outside on Taylor Avenue and inside nearby apartments.  (*Id.* at 124-25).  Many members of the Taylor Avenue

---

[2]    The allegations detailed in this section are taken from the Government's motion papers and supporting documents and from the evidence presented at the December 21, 2015 hearing.  On a transfer motion, the court must "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *United States* v. *Nelson*, 68 F.3d 583, 589 (2d Cir. 1995).

Crew, including A.O., were also members of the Bloods street gang.  (*Id.* at 88; *see also id.* at 115).[3]

The Taylor Avenue Crew had an ongoing, violent rivalry with the "Leland Avenue Crew," which was centered on Leland Avenue, two blocks away from Taylor Avenue.  (Tr. 90-92).[4]  That rivalry involved reciprocal shootings and retaliatory acts of violence, all of which were committed in order to maintain or increase the power of the Taylor Avenue Crew.  (*Id.* at 91 ("It's about turf.  It's about we are going to sell more drugs than you.  You are not allowed to sell drugs and my gang is tougher than yours.  Again, honor and pride.")).

### 2.    A.O.'s Involvement in the Taylor Avenue Crew

Law enforcement commenced an investigation into the Taylor Avenue Crew in 2013.  A.O. was not initially a target of the investigation, but became known to law enforcement as a result of his narcotics trafficking.  Using the street name "Krash," A.O. sold crack cocaine in the vicinity of Taylor Avenue along with other members of the Crew as part of a large-scale retail distribution business.  (Tr. 92-93, 105-09, 124).  He obtained the crack from co-defendant Irvin Ortiz.  (*Id.* at 105, 114-15; *see also id.* at 123-24 (noting that Ortiz was involved in enforcing the prohibition on unaffiliated sellers of narcotics on

---

[3]    The case agent in this matter, Detective Oscar Rivas of the New York City Police Department (the "NYPD") testified that the Taylor Avenue Crew, or at least a subset of its members, was also known as the Bugatti Boys, the Apes, or the Mac Ballas.  (Tr. 87-88, 122-23).  The Government further advises that the Mac Baller Brim and Gorilla Stone Dynasty are sets of the Bloods street gang.  (Tr. 88; Gov't Post-Hearing Br. 3).

[4]    The Court takes judicial notice that Taylor and Leland Avenues run parallel to each other and are separated by Theriot Avenue.  *See* Fed. R. Evid. 201.

Taylor Avenue, and in "decision-making about acts of violence that might be committed against people who violated that prohibition")).

Law enforcement officers made several controlled purchases of crack from A.O. in 2013.  (Tr. 106-07, 111, 119-20).  Law enforcement further understood that A.O. had been selling narcotics on behalf of the Taylor Avenue Crew for approximately three years prior to his 2015 arrest.  (*Id.* at 107 (noting that A.O. had been arrested in 2012 on narcotics and weapons charges, during the existence of the Crew)).

A.O. was identified by other members of the Taylor Avenue Crew as having a leadership position within the Crew; he supervised the narcotics-trafficking activities of at least two others, including co-defendant Gladys Morales and a male juvenile.  (Tr. 93-94, 105, 113-14, 122; *see also id.* at 93 ("We were told that [A.O.] is a drug dealer, he is known to carry guns, and he has a reputation to shoot people")).  While incarcerated on state charges, A.O. participated in multiple prison calls with Morales to discuss selling narcotics in order to raise bail money for A.O. and remitting payments to Ortiz.  (*Id.* at 108; *see also* GX 13-18, 13T-18T (recorded prison calls and transcripts)).

### 3.    A.O.'s Involvement in Two Attempted Murders

In a two-month span in 2014, at age 17, A.O. was involved in two separate shootings designed to protect and strengthen the Taylor Avenue Crew and his position in it.  On May 21, 2014, A.O. and Elijah Davila, another member of the Taylor Avenue Crew, were in a car in the vicinity of 1512 Leland Avenue.  A.O. fired multiple times at a crowd in front of 1512 Leland Avenue,

hitting a member of the Leland Avenue Crew (V-1) who was running into the building; the shooting was non-fatal.  (Tr. 103-04; *see also id.* at 104 (recounting that A.O. told a cooperating witness that A.O. had been in a car with Davila and "shot from the car and hit somebody while [the victim was] running inside a building")).  A.O. was armed with a .40 caliber pistol and fired at least seven times.  A crowd of people was in the area, as evidenced by surveillance video from the vicinity at the time of the shooting and numerous 911 calls made by those who had either witnessed or heard the shooting.

In July 2014, members of the Leland Avenue Crew pointed a gun at A.O. In retaliation, and to maintain both his reputation and that of the Taylor Avenue Crew, A.O. shot at and hit a member of the Leland Avenue Crew (V-2) on White Plains Road[5] on July 27, 2014; in the process, A.O. also shot two bystanders.  (Tr. 96-103, 117, 121-22).[6]  A.O. was accompanied during the shooting by other members and associates of the Taylor Avenue Crew, two of whom were identified as A.O.'s co-defendant, Elijah Davila, and A.O.'s brother, Leonard.  (*Id.* at 99-100 (identifying two of three individuals who accompanied A.O. from a surveillance video)).  A.O. was armed with a 9-millimeter pistol.  He fired multiple shots, striking V-1 and two innocent bystanders, all of whom were treated at a hospital and ultimately survived.

---

[5]     White Plains Road runs parallel to Taylor and Leland Avenues, though it is closer to Leland Avenue and is generally considered part of the Leland Avenue Crew's turf.  (*See* Tr. 97-98).

[6]     A.O. was recorded on surveillance video that captured the shooting, and was separately identified as the shooter by one of the victims.  (Tr. 98-99).

Police officers recovered nine shell casings from the scene, and a ballistics expert concluded that they were all fired from the same gun. (*See* Tr. 98 (testifying to recovery of shell casings)). Multiple pedestrians were in the area at the time of the shooting, as evidenced by the bystanders who were struck, the aforementioned surveillance video, and numerous 911 calls. (*Id.* at 117-18). After the shooting, A.O. bragged about having committed it, including the fact that it was on the news. (*Id.* at 102-03 (discussion of A.O. identifying himself to law enforcement in the video of the July 27 shooting and, separately, bragging to friends that A.O. had "made a movie," which was understood to be code for a shooting)).

## B.   Procedural Background

On September 9, 2015, the Government filed a juvenile information, S1 15 Cr. 608 (KPF), charging A.O. with committing acts of juvenile delinquency. On September 16, 2015, the Government filed a motion to transfer A.O. to adult status and to permit the Government to proceed against him by criminal indictment, pursuant to 18 U.S.C. § 5032. In response, the Court set a briefing schedule for the motion and directed the United States Probation Office to prepare a report to assist in assessing whether the transfer of A.O. to adult status was in the interests of justice. *See* 18 U.S.C. § 5037(e).

On December 17, 2015, the Government filed the Juvenile Information, superseding the information filed in September and charging A.O. with the five acts of juvenile delinquency outlined above. On December 21, 2015, the Court held a hearing at which four witnesses testified: (i) Dr. Cheryl Paradis, Psy.D.,

the Government's expert witness; (ii) NYPD Detective Oscar Rivas, the case agent; (iii) Dr. Stephen Reich, A.O.'s expert witness; and (iv) Carmen Otero, A.O.'s mother.  (*See* Tr.).  At the close of the hearing, the Court set a schedule for post-trial briefing; oral argument on the motion was then held on February 23, 2016, at which time the Court indicated its intent to retain an expert witness on its own behalf.

The Court retained Dr. Barry Rosenfeld, Ph.D., to prepare an expert report in the matter.  The report (the "Rosenfeld Report") was submitted to the Court on March 16, 2016.  That same day, the Court was advised of the Government's intent to file the S3 Indictment, which would charge A.O. in one or more counts as an adult.  The Court held a conference on April 5, 2016, at which time it discussed with the parties the degree to which the S3 Indictment would moot the instant motion and the schedule for supplemental briefing. Shortly after the conference, the Court disseminated the Rosenfeld Report to the parties.

On or about April 15, 2016,[7] the Government filed the S3 Indictment under seal.  Of note, the S3 Indictment charged A.O. as an adult in three counts: Count One, which charged A.O. and others with participating in a conspiracy proscribed by the Racketeering Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d); Count Eight, which charged A.O. and others with participating in a narcotics-trafficking

---

[7]     The docket reflects that the S3 Indictment was filed on April 15, 2016, though the document itself reflects a filing date of April 13, 2016.

conspiracy, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), and 846; and Count Thirteen, which charged A.O. alone with using, carrying, or possessing firearms in connection with the racketeering and narcotics-trafficking conspiracies, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.

On April 26 and 27, 2016, the parties submitted supplemental briefing addressing the Rosenfeld Report and the propriety of charging A.O. as an adult in the S3 Indictment.  In brief, the Government argued that it was entitled to charge A.O. as an adult, because he had — by continuing to participate in the racketeering and narcotics-trafficking activities of the Taylor Avenue Crew, and by continuing to use, carry, and possess firearms in connection with those activities after his eighteenth birthday — ratified his participation in a continuing offense that began when he was a juvenile.  (*See* Gov't Supp. Post-Hearing Br. 2-3 (citing, *inter alia*, *United States* v. *Wong*, 40 F.3d 1347, 1365 (2d Cir. 1994))).  The Government further indicated its intent to proceed on the motion to transfer with respect to those acts of juvenile delinquency that were not covered by the S3 Indictment: Counts Three, Four, and Five.  (*Id.* at 3). The defense agreed that, under the *Wong* decision, A.O. could be charged as an adult with respect to the offenses with which he was charged in the S3 Indictment.  (*See* A.O. Supp. Post-Hearing Br.; A.O. Second Supp. Post-Hearing Br.).

## DISCUSSION

### A.    Applicable Law

Under the JJDPA, a juvenile who is at least 15 years old, and who has allegedly committed an act that, if committed by an adult, "would be a felony that is a crime of violence," may be prosecuted as an adult if the Attorney General moves to transfer the juvenile for adult criminal prosecution, and a district court "finds that it is 'in the interest of justice' to grant a transfer." *United States* v. *Nelson*, 68 F.3d 583, 588 (2d Cir. 1995) ("*Nelson I*") (quoting 18 U.S.C. § 5032); *see generally United States* v. *Doe*, — F. Supp. 3d —, No. 15 Cr. 302 (MKB), 2015 WL 7422618, at *3 (E.D.N.Y. Oct. 29, 2015).

The three offenses remaining in the Juvenile Information are each a crime of violence that, if committed by an adult, would be a felony.  Further, the Attorney General, through her designated agent, has certified that the offenses charged in this case are felony crimes of violence, and that

> [t]here is a substantial federal interest in the case and the offenses to warrant the exercise of federal jurisdiction, due to the defendant's participation in a violent racketeering conspiracy that transacted in interstate commerce, his participation in violent racketeering activity, and his attempted murder and assault of one victim with a firearm on or about May 21, 2014 and of three victims with a firearm on or about July 27, 2014.

(Sealed Certification ¶ 3).

What remains is the Court's consideration of six factors set forth in 18 U.S.C. § 5032: "[i] the juvenile's age and social background; [ii] the nature of the offense alleged; [iii] the nature and extent of any prior delinquency record;

[iv] present psychological maturity and intellectual development; [v] the juvenile's response to past treatment efforts and the nature of those efforts; and [vi] available programs that are designed to treat the juvenile's behavior problems." *United States* v. *Sealed Defendant 1*, 563 F. App'x 91, 91 (2d Cir. 2014) (summary order) (quoting *Nelson I*, 68 F.3d at 588).  Given the presumption that exists in favor of juvenile adjudication, the burden is on the Government to establish, by a preponderance of the evidence, that transfer is warranted.  *See Nelson I*, 68 F.3d at 588; *see also United States* v. *Juvenile Male No. 1*, 47 F.3d 68, 71 (2d Cir. 1995); *United States* v. *John Doe #3*, 113 F. Supp. 2d 604, 605 (S.D.N.Y. 2000).

"In deciding whether to transfer a juvenile defendant to adult status, the district court need not accord each of the six factors equal weight — the court may balance the factors in any manner it feels appropriate." *United States* v. *Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) ("*Nelson II*").  Its inquiry is "permeated" by the juvenile system's goal of rehabilitation.  *Id.*  "Nevertheless, even though a juvenile's potential for rehabilitation is a 'crucial determinant in the transfer decision,' this factor 'must be balanced against the threat to society posed by juvenile crime.'" *United States* v. *Juvenile Male*, 844 F. Supp. 2d 312, 316 (E.D.N.Y. 2011) (quoting *Nelson II*, 90 F.3d at 640).  A "glimmer of hope" for future rehabilitation is insufficient; rather, the court must determine if the juvenile is likely to respond to rehabilitative efforts by striking the "appropriate balance [between] . . . affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will

11

be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Juvenile Male*, 844 F. Supp. 2d at 316 (quoting *Nelson II*, 90 F.3d at 640).

## B. Consideration of the Six Factors Favors A.O.'s Transfer to Adult Status

### 1. A.O.'s Age and Social Background

In assessing a juvenile's age and social background, "[t]he Second Circuit has instructed that a district court should consider a juvenile defendant's age not only at the time of the offense, but also at the time of the transfer hearing." *Juvenile Male*, 844 F. Supp. 2d at 316 (citing *Nelson I*, 68 F.3d at 589). The closer a juvenile is to age 18 at the time of the offense or transfer motion, the more the juvenile's age weighs in favor of transfer. *See Sealed Defendant 1*, 563 F. App'x at 92 ("TW was just three months shy of his eighteenth birthday when he allegedly committed the offense and twenty years old at the time of the transfer hearing"); *Juvenile Male*, 844 F. Supp. 2d at 317 ("The closer the juvenile is to the age of majority, the more this factor weighs in favor of transfer." (citation omitted)); *United States* v. *H.V.T.*, No. 96 Cr. 244 (RSP), 1997 WL 610767, at *3 (N.D.N.Y. Oct. 1, 1997) ("[Defendant] was almost 18 years old at the time of the conduct with which he is charged. Thus, the conduct did not occur when [Defendant] was very young, and age is a factor favoring transfer.").

A.O. was born in April 1997, and thus turned 18 years old in April 2015. On the dates of the charged shootings of V-1 (Count Three) and V-2 (Count Four), A.O. was, approximately, 17 years and 1 month and 17 years and 3 months, respectively. During the period charged in Count Five, 2012 through

September 2015, A.O. aged from 14 to 18.   A.O. is a "juvenile" within the definition of 18 U.S.C. § 5031 as to Counts Three, Four, and Five of the Juvenile Information, even though he is currently over 18 years old.[8]

While there are six separate factors, there is a degree of overlap in their consideration.  In other words, the Court cannot and does not evaluate A.O.'s age and social background in isolation, but rather considers them in conjunction with the other five factors.  Here, the Government ascribes significance to the facts that (i) A.O.'s participation in the Taylor Avenue Crew was concentrated in his later teenage years, and (ii) the severity of A.O.'s conduct escalated over time, with the most violent conduct occurring a few months before A.O. turned 18.  (*See* Gov't Post-Hearing Br. 10).  The Court agrees.

A.O. did not have an isolated episode of violent conduct at a very young age, nor did he have a smattering of low-level criminality punctuated by a single violent episode when he was close to the age of majority.  *United States* v. *Doe*, 49 F.3d 859, 867 (2d Cir. 1995) ("And because Doe had continued to engage in acts involving [the gang Born to Kill] up to just a year short of his eighteenth birthday, the conduct with which he was charged did not occur either when he was very young or as an isolated indiscretion.").  Quite to the contrary, A.O. had multiple encounters with law enforcement in his late teenage years in which he was found to be in the possession of narcotics or

---

[8]    On December 21, 2015, the date of the transfer hearing in this case, A.O. was 18 years and 8 months old.

firearms.  Neither these arrests, nor the various diversionary programs that were employed, deterred him from resuming criminal activity.  Even A.O.'s incarceration in the summer of 2014, when he was 17 years old, did not deter him from criminal activity, but merely caused him to adjust his narcotics trafficking (including his supervision of others) to conduct it from prison.

What is more, A.O. is alleged to have participated fully and over a period of years — as a drug dealer, a supervisor of other drug dealers, and, ultimately, a gunman — for a violent racketeering organization that terrorized one Bronx neighborhood.  And, as demonstrated by his inclusion in the S3 Indictment, A.O. continued to engage in racketeering and narcotics trafficking even after he turned 18.  Some courts have found importance where a juvenile's criminal conduct occurred over an extended period of time and was prevented from extending into the age of majority only by the interruption of law enforcement; here, the fact that A.O. persisted in violent criminal conduct (albeit with no further shootings) after turning 18 lessens the likelihood of his rehabilitation.

The Court also considers A.O.'s social background.  The information before the Court indicates that A.O. is a United States citizen who has resided in the Bronx for most of his life; he has very close ties to his mother and siblings.  A.O. presented evidence at the December 21 hearing that he was subject to abuse, neglect, and episodes of abandonment as a by-product of his mother's domestic partnership with the father of her three youngest children.  (*See* A.O. Post-Hearing Br. 5 (citing Tr.)).  While the Government has identified inconsistencies between this evidence and other information provided by A.O.

14

and his mother (*see* Gov't Post-Hearing Br. 12-13), the Court accepts that A.O. was raised in an abusive environment (*see* GX 1 (Administration for Children's Services ("ACS") notes reflecting discussions with A.O. and his mother about the abusive domestic relationship)). The Court also accepts that A.O. has experienced other disturbing or traumatic episodes in his life, including the suicide of his cousin and the deaths of several friends. (Rosenfeld Report 3-4). The relevant inquiry, however, is whether this background suggests that A.O. will respond to rehabilitative efforts while being treated as a juvenile. *See, e.g.*, *Juvenile Male*, 844 F. Supp. 2d at 340 ("Although defendant indicated to Dr. Drob that he would like to remove himself from past gang associations, take college courses, and develop a career, the Court finds that the defendant's background indicates that it is highly unlikely that he would be able to rehabilitate himself in the short period of time before he would have to be released from juvenile custody if he were convicted on the offenses charged."); *United States* v. *Juvenile Male No. 2*, 761 F. Supp. 2d 27, 36 (E.D.N.Y. 2011) ("[G]iven the defendant's continuing and long-term affiliation with his gang and the absence of any stable adult figures in his life who could possibly control his behavior, the Court finds that the defendant's social background makes it highly unlikely that he could be rehabilitated in the short period of time before he would have to be released from juvenile custody under federal law."). For the reasons stated throughout this Opinion, the Court is constrained to conclude that A.O. is unlikely to be rehabilitated in the prescribed time frame, and thus finds that the first factor weighs in favor of transfer.

## 2.    The Nature of the Offenses Charged

As noted, the Court does not undertake an examination of the strength of the Government's evidence in evaluating a transfer motion, but instead "assume[s] that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *Nelson I*, 68 F.3d at 589; *see also United States* v. *Doe #1*, 74 F. Supp. 2d 310, 317 n.6 (S.D.N.Y. 1999) ("For the purpose of a transfer determination, the court must assume that the juvenile committed the offenses charged in the indictment.").  A.O. does not dispute the seriousness of the conduct alleged in Counts Three, Four, and Five of the Juvenile Information, but rather suggests that the Court focus on the absence of detailed evidence concerning the hierarchy within the Taylor Avenue Crew.  (*See* A.O. Post-Hearing Br. 5-6).  Such a focus may have been appropriate when considering the motion to transfer with respect to Counts One and Two of the Juvenile Information, *i.e.*, the two charges involving group conduct.  However, because those two counts have been mooted by the filing of the S3 Indictment, the Court focuses on the three remaining counts, which pertain to A.O. alone and which involve egregious criminal conduct — the intentional shooting of two people, the reckless shooting of several others, and the conscious decision to carry a firearm in connection with racketeering and narcotics-trafficking offenses.  Stated simply, given the seriousness of these offenses, the fact that they involve A.O.'s individual conduct, and their occurrence so close to his eighteenth birthday, the Court finds this factor to be the most important in its analysis, and further finds that it weighs in favor of

16

transfer.  *See Juvenile Male*, 844 F. Supp. 2d at 341 ("The Court finds not only that this factor weighs overwhelmingly in favor of transfer, but also that this factor should be afforded more weight than any of the other factors." (citing *Nelson I*, 68 F.3d at 590)).

### 3.    A.O.'s Prior Delinquency Record

A.O. has one prior juvenile adjudication and one prior youthful offender adjudication.  (*See generally* GX 7 (A.O. juvenile records)).  With respect to the former, A.O. was arrested on March 14, 2012, while in possession of a .38 caliber revolver loaded with six rounds of ammunition.  He acknowledged that he "owned [the] gun [at issue] and purchased it [the] year prior," and that he "carried it around occasionally."  (*Id.* at 15; Juvenile Transfer Investigation Report (the "Probation Report") ¶¶ 7-10).  On May 8, 2012, A.O. was adjudicated guilty of Criminal Possession of a Weapon in the Second Degree. He was sentenced to 18 months' residential placement.

A.O.'s 2014 youthful offender adjudication stems from an October 21, 2013 incident in which A.O. was arrested inside an apartment where police officers found a loaded 9-millimeter pistol and approximately 14 small bags of crack cocaine.  (Probation Report ¶¶ 12-15).  Ultimately, A.O. admitted that the gun and the drugs were his.  (*Id.* at ¶¶ 12, 14).  On January 14, 2014, A.O. was convicted of Criminal Possession of a Weapon in the Fourth Degree.  On February 18, 2014, he was adjudicated a youthful offender and was sentenced to 90 days' incarceration.

The parties note several arrests for which charges are still pending against A.O., including an August 2014 arrest on attempted murder, assault, and firearms charges and a February 2015 arrest for Criminal Sale of a Controlled Substance in the Third Degree; it is presumed that this conduct is subsumed, in whole or in part, by the Juvenile Information.  In addition, two of A.O.'s prior arrests — an April 2014 arrest for Criminal Possession of Marijuana in the Fifth Degree and an August 2014 arrest for Gang Assault in the Second Degree — were resolved by dismissals of the cases.  The Government has asked the Court to consider the arrests, while A.O. argues that they are either irrelevant or subsumed within the conduct charged in this Court.  (*Compare* Gov't Post-Hearing Br. 16-18, *with* A.O. Post-Hearing Br. 6-7).  Ultimately, the Court need not resolve this dispute, because it finds significant A.O.'s prior adjudications, which involve conduct that is substantively indistinct from the conduct with which he is now charged.  *Cf. Doe*, 2015 WL 7422618, at *13 (discussing split in circuit authority regarding the consideration of unadjudicated conduct and concluding, "The Court does not consider Defendant's unadjudicated conduct in determining the scope of his delinquency record, but considers it in assessing Defendant's psychological maturity and intellectual development.").  The Court finds that this factor weighs in favor of transfer.

### 4.   A.O.'s Present Psychological Maturity and Intellectual Development

Courts have found that a juvenile's present intellectual development and psychological maturity support transfer where the juvenile is closer to average levels of intelligence and emotional or psychological maturity for the juvenile's age. *See Juvenile Male*, 844 F. Supp. 2d at 345-46 ("Thus, although defendant's immaturity weighs against transfer, the defendant's average intelligence, strong verbal reasoning skills, and logical and coherent responses weigh in favor of transfer."). In connection with this factor, the Court received reports from the Government's expert witness, Dr. Paradis, and A.O.'s expert witness, Dr. Reich, and heard testimony from each at the December 21, 2015 hearing.

Summarily speaking, Dr. Paradis concluded — after an interview of A.O. that involved the administration of certain psychological tests and a review of various records — that A.O.'s "history and presentation are not consistent with deficits in intellectual development of psychological immaturity," and that in her opinion, he was "a young man of average intelligence and maturity." (GX 10 at 8 (Paradis expert report); *see also* GX 21 (Paradis supplemental report, indicating no change in opinion about A.O.'s general level of intelligence and maturity)). She reiterated this opinion at the December 21 hearing: "To me, he seemed like a typical person of that age." (Tr. 45).[9] By contrast, Dr.

---

[9]     *See also* Tr. 58-59 (testimony of Dr. Paradis):

> My conclusion was that [A.O.] is a young man with most likely average intellectual potential who is functioning, mostly because of his erratic education, in the low average range but that he is a

Reich, on the basis of an interview that was truncated by A.O.'s refusal to participate in it, concluded that "[A.O.] demonstrated significant emotional immaturity during my evaluation of him, and at the time of whatever acts he may have committed (which he did not discuss with me), did not have the judgment of an adult.  He displayed the emotional vulnerability and lack of emotional acuity of an early to mid-teenager, and not an emotionally aware adult."  (DX A at 10 (Reich expert report)).

While the Court appreciated the time and attention paid by each of the expert witnesses to this important issue, it was left with several questions after considering their opinions.  With respect to Dr. Paradis, for example, the Court had some difficulty reconciling her assessments of A.O.'s maturity with certain prior assessments and test results of his cognitive abilities.  With respect to Dr. Reich, the Court had difficulty following his conclusion that A.O.'s refusal to participate in the interview, under the circumstances described, necessarily bespoke immaturity.  In consequence, the Court retained Dr. Rosenfeld to provide an expert report that itself considered the opinions of the parties' experts; the Rosenfeld Report was then transmitted to the parties for their consideration.

---

typical young man of that age, meaning he has got some areas of maturity but he is certainly not a full-fledged adult.  He is not a 30-year-old and like young men, adolescents, the adolescent brain doesn't finish developing, they're saying, neuroscience is showing until the age of 25.  So, I didn't find him any different than a lot of the people that I know that are his age.

Dr. Rosenfeld's conclusions, as relevant to this analysis, include the following:

- "[A.O.] revealed several indicators of a posttraumatic stress disorder (PTSD), such as intrusive memories and avoidance behaviors, but appears to have coped with these losses primarily by developing a 'tough' veneer (and using controlled substances)." (Rosenfeld Report 7).

- "[W]hile Dr. Paradis characterized [A.O.]'s intellectual functioning as 'average', the available evidence indicates that his intelligence is well below average. Even if a lack of motivation and poor frustration tolerance resulted in some mild deflation in his IQ scores, his test results would still fall well below average when compared to normative data. That said, [A.O.] is able to communicate and relate in a manner that may serve to mask his intellectual deficits (likely giving the impression that he is more intelligent than is actually the case). Moreover, while his intelligence is below average, [A.O.]'s intellectual functioning is not so severe as to impair his ability to function on a day-to-day level, nor to succeed in a supportive academic setting." (*Id.*).

- "[A.O.'s] behaviors, while modest in severity, are suggestive of a moderate degree of immaturity. On the other hand, [A.O.] has developed (by necessity) the ability to care for himself, having lived independently much of the time that he has not been in juvenile rehabilitation or detention facilities (or incarcerated). In short, while [A.O.] demonstrates deficits in his emotional and psychological development, particularly relative to others his age, other aspects of his psychological development are more intact (e.g., independence and adaptive functioning)." (*Id.* at 8).

- "[A.O.]'s level of maturity appears below that expected of peers his age, particularly with regard to emotional and social functioning. Finally, while [A.O.] has received some mental health treatment in the past, this treatment is far less intensive than would be needed given the magnitude of the problems he has exhibited (e.g., an arrest for carrying a loaded handgun at age 14)." (*Id.* at 8-9).

Unsurprisingly, the Government argues that Dr. Rosenfeld's opinion is insufficiently substantiated or outweighed by other evidence, while A.O. contends that it compels denial of the Government's motion.  (*Compare* Gov't Supp. Post-Hearing Br. 4-5, *with* A.O. Supp. Post-Hearing Br. 2-3).

Much time was spent during the December 21, 2015 hearing addressing Dr. Paradis's definitions of "adult" and "young adult."  However, the ultimate test is not whether A.O. is (or was during the relevant time period) an "adult," but whether he possesses an intelligence and maturity compatible with his age. Here, the Court finds Dr. Rosenfeld's analysis of A.O.'s maturity to be the most logical and persuasive of the three expert opinions: A.O.'s upbringing and his occasional bouts of what has been described as an "oppositional attitude and poor frustration tolerance" (Rosenfeld Report 8) are best interpreted as a degree of immaturity relative to his peers.  However, the Court finds this degree to be modest, given the many demonstrations of A.O.'s ability to live and function independently (indeed, to the point of supervising others in the Taylor Avenue Crew).  The Court has also considered the manner in which A.O. presented himself at the various interviews (including that of Dr. Reich), and its own observations of A.O.'s demeanor throughout these proceedings.  Thus, the Court finds this factor to weigh against transfer, though it is far outweighed by other factors favoring transfer.  *Cf. United States* v. *Dion L.*, 19 F. Supp. 2d 1224, 1226 (D.N.M. 1998) (transferring to adult status defendant who was "at least of average intelligence," but "psychologically immature and something of a follower," where other factors weighed in favor of transfer).

22

### 5.    A.O.'s Response to Past Treatment Efforts

A.O. has a substantial record of failed treatment efforts, outlined by the

Government and the Probation Office.  (*See* Gov't Post-Hearing Br. 23-26;

Probation Report ¶¶ 8-10, 22, 25).[10]  They include: (i) the placement imposed in

response to A.O.'s prior juvenile delinquency finding in 2012; (ii) the term of

incarceration imposed after A.O.'s juvenile offender adjudication in 2014; and

(iii) the prior services provided to A.O. throughout his youth, including by ACS.

(*See generally* GX 1-9).

While awaiting adjudication on his March 14, 2012 weapons arrest, A.O.

"initiated a fight with another juvenile" on or about April 4, 2012.  (Probation

Report ¶ 8).  A few weeks later, A.O. "without provocation, . . . punched a peer

in his face." (*Id.*; GX 7 at 19).  As a result, he was transferred to secure

detention.  (Probation Report ¶ 8).  A.O.'s juvenile records further reflect

"numerous verbal and physical altercations with peers in other … facilities."

(GX 7 at 20).

Once the finding of juvenile delinquency was entered, A.O. was placed at

the Graham Windham Residential Treatment Center in Brooklyn, New York.

(Probation Report ¶ 9).  There, A.O. was found to have made a "marginal

institutional adjustment." (*Id.*; *see generally* GX 2).  Specifically, a

psychological report noted that A.O.'s "acting out behaviors and attendance

have improved marginally since his enrollment at the Graham School." (GX 2

---

[10]    The factual content of this section is taken largely from the Government's post-hearing
brief, which content the defense does not dispute.

at 35).  Unfortunately, "over eight months, numerous incident reports were filed, citing [A.O.] with disciplinary infractions … [including] five separate occasions [when A.O.] was reported missing." (Probation Report ¶ 9; *see also* GX 2 at 8-13, 49-60).

A.O. failed to demonstrate substantial improvement upon his release from Graham Windham, at which point he was supervised under the "ACS Close to Home Initiative." (Probation Report ¶ 9; *see generally* GX 1).  A.O. repeatedly failed to attend school as required, failed to check in, and refused to attend weekly counseling sessions.  (*See* GX 1 at 8, 10-17, 19, 28-35).  At one point, A.O. failed to check in with ACS for four months.  (Probation Report ¶ 9; GX 1 at 22).

In or about October 2013, approximately 10 days after he resumed checking in with ACS, A.O. was arrested for criminal possession of a weapon, adjudicated a youthful offender, and sentenced to 90 days' imprisonment. (Probation Report ¶ 12).  While incarcerated, A.O. had a number of infractions, including hitting other inmates.  (*Id.* at ¶ 15; GX 8 at 143-92).  Following his term of incarceration, A.O. was placed at the Good Shepherd Services–Barbara Blum NSP facility in Brooklyn to complete the 18-month placement resulting from his juvenile delinquency adjudication.  (Probation Report ¶ 10).  While in the facility, A.O. had numerous infractions, including punching other residents.  (GX 1 at 91-100).  He was discharged on or about April 13, 2014, but remained under the care of ACS through in or about July 2014.  (Probation Report ¶ 10; GX 1).

24

On April 26, 2014, approximately two weeks after being discharged, and while still under ACS supervision, A.O. was arrested on a marijuana charge. (Probation Report ¶ 16; GX 1 at 43). A.O. continued to have difficulty adjusting to supervision, failing to attend drug treatment sessions consistently and testing positive for marijuana. (GX 1 at 55-56, 59-67, 72-73, 80).

Following his August 2014 arrest on charges related to those in the instant case, A.O. was incarcerated for a period of time before being released on bail. During his time in jail, A.O. was again involved in a violent infraction that included punching another inmate. (GX 8 at 7-117). As noted previously, A.O. also continued to engage in narcotics trafficking while incarcerated. (*See* GX 13-18, 13T-18T).

After his release on bail, in or about February 2015, A.O. was again arrested on narcotics charges. As part of that case, A.O. was enrolled in the BronxConnect Alternative to Incarceration ("ATI") program. (GX 6). In or about July 2015, A.O. was terminated from the ATI program due to his failure to attend mandatory sessions. (*Id.*).

In connection with the Government's motion, the Court has reviewed the school and ACS records included with the Government's exhibits. (*See* GX 1-2).[11] The Court was impressed by the diligence with which the ACS professionals, in particular, performed their jobs. Several therapists and social workers met repeatedly with A.O. and his family, discussing with them things

---

[11]     The Court's review was also undertaken in light of statements made by A.O.'s mother with respect to the quality of services provided by ACS to A.O. (*See* Rosenfeld Report 4).

both good (A.O.'s school interests, the closeness of A.O.'s family) and bad (the detrimental impact of A.O.'s stepfather on the family unit, A.O.'s absences from school and from counseling programs, and his use of controlled substances). Over many months, these individuals provided useful services to A.O. and his family; at one point, A.O. was slated to receive assistance with behavioral issues, substance abuse problems, and work opportunities simultaneously. (GX 1 at 38-39).[12] And while it is clear that the therapists and social workers were kept in the dark by A.O. about the worst of his criminal conduct during this period, they were not naïve: One therapist asked A.O. specifically if he was trafficking in narcotics (*id.* at 16-17), and ACS was aware of his arrests and his gang affiliations.  The instant prosecution suggests that these efforts ultimately failed; the point to be made is that any failure was not for lack of trying. Accordingly, this factor weighs in favor of transfer.

### 6.    The Available Programs to Treat A.O.'s Behavioral Problems

The Government relates that, according to supervisory legal personnel at the Bureau of Prisons ("BOP"), there are no federal facilities for individuals adjudicated as juvenile delinquents under federal law.  (Gov't Post-Hearing Br. 27-28).  BOP does, however, have contracts with several secure state-run facilities where federal juvenile delinquents convicted of violent crimes, including those who are already over 18 years old, can be detained.  (GX 19 at ¶¶ 4-5).  Although there are no such facilities in New York State, there are

---

[12]    The Court accepts Dr. Rosenfeld's opinion, however, that A.O. did not receive mental health treatment to an appropriate degree.  (Rosenfeld Report 9).

facilities where A.O. could be housed in Maine and the District of Columbia, as well as other similar facilities in other areas of the United States.  (*Id.* at ¶¶ 5, 8).

As noted by the Second Circuit, the Government must "do more than merely assert the unavailability of an appropriate program."  *Nelson I*, 68 F.3d at 591.  Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program."  *Id.*  In this case, there is some indication that state juvenile facilities in either Maine or the District of Columbia might be able to house A.O.  Thus, the Court finds that this factor weighs against transfer, but does not outweigh the first, second, third, and fifth factors, which, in combination, overwhelmingly favor transfer.

## CONCLUSION

These proceedings have spanned several months precisely because of their importance: The Court needed as much information as possible, concerning all facets of A.O.'s life, in order to arrive at its decision.  Ultimately, the Court is struck by the egregious criminal conduct in which A.O. engaged, despite the support and love of his mother and sisters (indeed, his brother was a comrade-in-arms in this conduct), despite frequent contacts with law enforcement, and despite several efforts at intervention.  A.O.'s conduct is too wide-ranging, too detrimental, and too close to the age of majority to warrant his treatment as a juvenile.  With a measure of regret, the Court has evaluated the six factors and concluded that A.O.'s transfer to adult status is justified.

For the reasons set forth above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of A.O. to adult status with respect to Counts Three, Four, and Five of the Juvenile Information is in the interest of justice. Accordingly, the Government's motion to transfer A.O. to District Court for prosecution as an adult is GRANTED.

The parties are ORDERED to appear at a pretrial conference on **July 6, 2016, at 10:00 a.m.** in Courtroom 618 of the Thurgood Marshall U.S. Courthouse to discuss, among other things, (i) the propriety of unsealing the papers related to this motion, including this Opinion, and (ii) next steps in the case.

SO ORDERED.

Dated:      June 13, 2016
            New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge

28